UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| AMCO INSURANCE COMPANY, | Civil No. 05-1296 (PJS/JJG) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| STEVEN DORPINGHAUS, d/b/a DORPINGHAUS CONSTRUCTION, TOMMY JOHN LOKKEN, RICHARD JOHN RIMER, and ANTHONY STEVEN DORPINGHAUS, | |
| Defendants. | |

---

Robert E. Kuderer and Stacey A. Nilsen, JOHNSON & CONDON, P.A., 7401 Metro Boulevard, Suite 600, Minneapolis, MN 55439, for plaintiff.

John H. Guthmann, HANSEN DORDELL BRADT ODLAUG & BRADT, PLLP, 3900 Northwoods Drive, Suite 250, St. Paul, MN 55112, for defendant Steven Dorpinghaus, d/b/a Dorpinghaus Construction.

Robert J. Lange, LANGE LAW FIRM, 5270 West 84th Street, Suite 300, Bloomington, MN 55437, for defendant Tommy John Lokken.

Chad J. Hintz, BURKE & THOMAS, PLLP, 3900 Northwoods Drive, Suite 200, St. Paul, MN 55112, for defendant Richard John Rimer.

Kurt J. Erickson, McCOLLUM CROWLEY MOSCHET & MILLER, LTD., 7900 Xerxes Avenue South, Suite 700, Minneapolis, MN 55431, for defendant Anthony Steven Dorpinghaus.

On January 27, 2005, Richard John Rimer ("Richie"), Tommy John Lokken ("Tommy"), and Anthony Steven Dorpinghaus ("Tony") were injured while working for Tony's father, Steven Dorpinghaus, who was doing business as Dorpinghaus Construction. At the time, Dorpinghaus Construction was insured by AMCO Insurance Company ("AMCO"). AMCO

filed this declaratory judgment action to determine whether its policy provides coverage for Richie's, Tommy's, and Tony's injuries. That question turns in part on whether Richie, Tommy, and Tony were "employees" of Dorpinghaus Construction for purposes of the AMCO policy. All of the parties have moved for summary judgment on this issue.

## I. BACKGROUND[1]

### A. *The Delk Project*

In the fall of 2004, Dorpinghaus Construction agreed to build a home and a hangar garage for Kevin Delk in Webster, Minnesota. This was a major project that took about a year to complete and that was expected to require the assistance of a variety of subcontractors, including a subcontractor to do the framing. Steven Dorpinghaus tried to retain Steve Merrifield of Merrifield Construction and Rick Gunderson of Gunderson Construction, both framing subcontractors whom he had used on other projects, to assist with the Delk project. Steven Dorpinghaus Dep. 40, Aug. 30, 2005 ("S. Dorpinghaus I Dep."). But neither Merrifield nor Gunderson was available. Steven Dorpinghaus Dep. 88, Mar. 22-23, 2006 ("S. Dorpinghaus II Dep.").

Steven Dorpinghaus's son, Tony, had done some construction work in the past — and, in fact, had some experience with framing. S. Dorpinghaus II Dep. 24-25, 28. When it became clear that Merrifield and Gunderson were not available, Steven and Tony agreed that Tony

---

[1] The record contains conflicting accounts concerning such matters as when and how Steven first spoke with Tony, Richie, and Tommy about doing the framing on the Delk project and the manner in which they were to be paid. Because resolution of these matters is not material to the Court's consideration of the meaning of "temporary worker" in the insurance policy, the Court has pieced together an account of the factual background from various witnesses' testimony without attempting to describe every discrepancy.

would help with the framing.  Anthony Dorpinghaus Dep. 28-30 ("A. Dorpinghaus Dep."); S. Dorpinghaus II Dep. 95-96.  (At the time, Tony was employed by another family-owned business, Meats, Meals and More.  A. Dorpinghaus Dep. 16-17.)  Knowing that he could not frame the Delk project alone, Tony contacted Richie, a close friend since childhood, and asked him to help with the framing.  A. Dorpinghaus Dep. 33-34; Rimer Dep. 19-20, Mar. 23, 2006 ("Rimer II Dep.").

Richie was the sole proprietor of Richie's Dreamscapes, a "hardscape" construction business he started in April 2004 that performs such work as building retaining walls and patios.  Rimer II Dep. 12.  Richie grew up with Tony, knew Steven Dorpinghaus very well, and jokingly estimated that he had "spent a third of [his] life at [the Dorpinghaus] house."  Rimer Dep. 32-33, Sept. 27, 2005 ("Rimer I Dep.").  When Tony first contacted Richie about framing the Delk project, Richie was not sure that he would be able to take on the project.  Eventually, though, he agreed to help.  After talking with Tony, Richie spoke directly with Steven Dorpinghaus about the amount of work that needed to be done and the terms of payment.  S. Dorpinghaus I Dep. 44; Rimer I Dep. 29.

Tommy was a childhood friend of both Tony and Richie.  He was the sole proprietor of Do-It-Rite Lawn Care & Snow Removal, which tends lawns in the summer and removes snow in the winter.  S. Dorpinghaus II Dep. 12-13.  Tommy heard about the Delk project, and asked if he could work on it too.  Lokken Dep. 45.  Steven Dorpinghaus agreed and later discussed with Tommy how much he would be paid for the framing help.  S. Dorpinghaus I Dep. 44.

After "each ma[king] their own deals with Steve Dorpinghaus," S. Dorpinghaus Mem. Opp'n Summ. J. 4 n.2, Richie, Tommy, and Tony began working on framing the Delk project in

December 2004. Both Richie and Tommy also continued to run their own businesses. Rimer II Dep. 91, 104; Lokken Dep. 47, 53. Richie, Tommy, and Tony worked on the Delk project without incident until January 27, 2005, when the scaffolding on which they were working collapsed. Rimer II Dep. 100. All three suffered serious injuries. Lokken Dep. 101-02; S. Dorpinghaus I Dep. 80-82; S. Dorpinghaus II Dep. 181-83.

*B. The AMCO Policy*

At the time that Richie, Tommy, and Tony were injured, Dorpinghaus Construction was insured under a commercial general liability ("CGL") policy issued by AMCO. Nilsen Aff. Ex. 2 ("AMCO Policy"). The policy excludes coverage for any "bodily injury" to an "employee" of Dorpinghaus Construction. AMCO Policy § IA ¶ 2(e)(1). More specifically, the exclusions section provides that the policy does not cover:

"Bodily injury" to:

1) An "employee" of the insured arising out of and in the course of:

a) Employment by the insured; or

b) Performing duties related to the conduct of the insured's business[.]

AMCO Policy § IA ¶ 2(e).

The definitions section of the AMCO policy provides that: "'Employee' includes a 'leased worker.' 'Employee' does not include a 'temporary worker.'" AMCO Policy § V ¶ 5. "Leased worker" and "temporary worker" are defined as follows:

"Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker". . . .

> "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

AMCO Policy § V ¶¶ 10, 19.

In short, coverage for Richie's, Tommy's, and Tony's injuries depends in part on whether they were employees of Dorpinghaus Construction at the time that they were injured. The defendants argue that the three young men were not employees for two reasons. First, the defendants argue that the young men were working as independent contractors, not employees. Second, the defendants argue that, even if the young men were working as employees, they were "[t]emporary worker[s]," and thus excluded from the definition of "employee" under the policy.

A lot turns on this question. The reason that policies such as AMCO's exclude injuries to employees is that such injuries are supposed to be covered by worker's compensation insurance, not by CGL insurance. But Dorpinghaus Construction, rightly or wrongly, did not carry worker's compensation insurance. S. Dorpinghaus I Dep. 98-99. If Richie, Tommy, and Tony are to have any chance of a significant recovery, they must establish that they were not employees of Dorpinghaus Construction and thus not limited to recovering under the company's non-existent worker's compensation policy.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]."  *Baucom v. Holiday Cos.*, 428 F.3d 764, 766 (8th Cir. 2005).  In considering a motion for summary judgment, a court must resolve factual disputes in favor of the nonmoving party.  *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987).

### B.  "Independent Contractor" v. "Employee"

AMCO has moved for summary judgment on the question of whether Richie, Tommy, and Tony were working as independent contractors at the time that they were injured.  AMCO argues that the evidence that the young men were not working as independent contractors — but were instead working as employees — is so compelling that no reasonable jury could find otherwise.  The defendants disagree, pointing to evidence that the three young men were working as independent contractors.  At oral argument, the Court agreed with the defendants and denied AMCO's motion insofar as it sought a declaration that Richie, Tommy, and Tony were not functioning as independent contractors.  The Court concluded that, while the evidence certainly favors AMCO's position, a reasonable jury could find that the young men were working as independent contractors at the time that the scaffolding collapsed.  That question will have to be tried.

### C.  The "Temporary-Worker" Definition

All parties have moved for summary judgment on the question of whether Richie, Tommy, and Tony were temporary workers for purposes of the AMCO policy.  If the jury finds that the three young men were working as independent contractors, then this issue will become

moot, as the exclusion for bodily injuries to employees will not apply. But if the jury finds that the three young men were working as employees, then the exclusion for bodily injuries to employees will apply *unless* the three young men are deemed to be temporary workers. Again, the AMCO policy provides that the term "employee" does not include a "temporary worker," and the policy defines "temporary worker" as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." AMCO Policy § V ¶¶ 5, 19.

The crux of the dispute is whether Richie, Tommy, or Tony were "furnished" to Dorpinghaus Construction.[2] The policy informs the insured — here, Dorpinghaus Construction — that a temporary worker is "a person who is *furnished to you* . . . to meet . . . short-term workload conditions." AMCO Policy § V ¶ 19 (emphasis added). AMCO argues that "furnished" is unambiguous, and that Richie, Tommy, and Tony were not temporary workers because they were not furnished to Dorpinghaus Construction by a third party, such as a temporary employment agency. The defendants disagree. They argue that "furnished" is ambiguous and does not necessarily require that a third party do the furnishing. Rather, they argue, a worker can furnish himself to an employer. Alternatively, they argue that, even if a third party must do the furnishing, Richie and Tommy were in fact furnished to Dorpinghaus

---

[2] AMCO also argues that Richie, Tommy, and Tony were not furnished to meet "seasonal or short-term" needs, but the bulk of the evidence is that the young men were hired to work on a single project — the Delk project — because of the unavailability of the usual framing subcontractors and with no agreement that they would continue to work for Dorpinghaus Construction after the Delk project was completed. Moreover, both Richie and Tommy maintained their independent businesses while working for Dorpinghaus Construction. Rimer II Dep. 91, 104; Lokken Dep. 47, 53.

Construction by a third party — either by their friend Tony or by their respective businesses (Richie's Dreamscapes and Do-It-Rite Lawn Care & Snow Removal).

The interpretation of a term in an insurance contract presents a question of law for the court. *See Am. Family Ins. Co. v. Walser*, 628 N.W.2d 604, 609 (Minn. 2001). Unambiguous terms will be given their plain and ordinary meaning, and courts should "not construe the terms so as to lead to a harsh and absurd result." *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). An ambiguous term — one that is reasonably susceptible of more than one interpretation — is treated differently. *See Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979). Such a term will be "resolved in accordance with the reasonable expectations of the insured." *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 181 (Minn. 1990).

Not every contract term that has more than one meaning is ambiguous. *See Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn. 1994). "The sense of a word depends on how it is being used; only if more than one meaning applies *within that context* does ambiguity arise." *Id.* (emphasis added). Courts must be careful not to read ambiguities into the plain language of an insurance policy, *see Farkas v. Hartford Accident & Indem. Co.*, 173 N.W.2d 21, 24 (Minn. 1969), and "[i]n undertaking such an assessment, the court must fastidiously guard against any invitation to 'create ambiguities' where there are none," *Adzick v. UNUM Life Ins. Co. of Am.*, 351 F.3d 883, 887 (8th Cir. 2003) (applying Minnesota law).

The AMCO policy does not define "furnished to you," and the phrase has not been interpreted by any Minnesota court in the context of a CGL policy.[3] But the courts of other jurisdictions have interpreted the phrase on several occasions, as the phrase commonly appears in CGL policies.[4] A majority of those courts have found that a worker is not furnished to an insured unless a third party — typically a staffing agency — has been involved in providing or supplying the worker to the insured. *See, e.g.*, *Nautilus Ins. Co. v. Gardner*, No. 04-1858, 2005 WL 664358, at *6-7 (E.D. Pa. Mar. 21, 2005); *Brown v. Ind. Ins. Co.*, 184 S.W.3d 528, 537 (Ky. 2005); *Monticello Ins. Co. v. Dion*, 836 N.E.2d 1112, 1115 (Mass. App. Ct. 2005); *Nationwide Mut. Ins. Co. v. Allen*, 850 A.2d 1047, 1055 (Conn. App. Ct. 2004).

The defendants, however, rely on the opinions of the minority of courts that have found either that the phrase "furnished to you" is ambiguous or that it does not require the involvement of a third party. *See, e.g., Bituminous Cas. Corp. v. Mike Ross, Inc.*, 413 F. Supp. 2d 740, 745 (N.D.W. Va. 2006); *Am. Family Mut. Ins. Co. v. As One, Inc.*, 189 S.W.3d 194, 198 (Mo. Ct.

---

[3] Minnesota courts have discussed the definition of "furnish" as used in "literally hundreds of statutes" and found its usage unambiguous. *See, e.g., Homart Dev. Co. v. County of Hennepin*, 538 N.W.2d 907, 911-12 (Minn. 1995) ("'Furnish' is defined as 'to supply [or] provide.' *Black's Law Dictionary* 675 (6th ed. 1990)."); *Frisch v. Basset*, No. C9-95-2043, 1996 WL 104770, at *2 (Minn. Ct. App. Mar. 12, 1996) ("Black's [Law Dictionary] defines 'furnish': To supply, provide, or equip, for accomplishment of a particular purpose.").

[4] Like most of the language in AMCO's policy, this phrase is standard CGL language developed and circulated by the Insurance Services Office, Inc. ("ISO"). *See Am. Family Mut. Ins. Co. v. Tickle*, 99 S.W.3d 25, 30 (Mo. Ct. App. 2003). It appears that ISO added the definitions of "employee," "leased worker," and "temporary worker" in 1993 to "cover the non-traditional employment relationship where a client company is using the services of employees of a staffing company." *Id.* (citing Jack P. Gibson, et al., Int'l Risk Mgmt. Inst., Inc., 1 Commercial Liability Insurance §§ V.L.9-.10, .22, .50 (Jan. 2002)). The parties appear to agree that the definitions section of AMCO's policy was not specifically tailored to Dorpinghaus Construction or to Minnesota companies.

App. 2006). According to these courts — and the defendants — a worker can furnish himself to an employer simply by showing up for work. In *As One*, the Missouri Court of Appeals found that, "[i]n the context of a worker, there is no requirement in 'providing' or 'supplying' or 'furnishing,' which mandates that the worker must be supplied, provided, or furnished to you by someone else." 189 S.W.3d at 198. The *As One* court apparently concluded that *every* "worker furnishes himself to work" on a daily basis. *Id.* In *Bituminous*, the court explained that, "[b]ased upon the words of the insurance policy alone, it is impossible for the court to determine what is meant by the phrase 'furnished to.'" 413 F. Supp. 2d at 745.

This Court agrees with the majority of courts that the phrase "furnished to you" is not ambiguous and "necessarily connotes some involvement by a third person." *Monticello*, 836 N.E.2d at 1115. In the Court's view, AMCO's interpretation of the phrase is far more reasonable than the defendants'. Suppose, for example, that a law firm advertised for a legal secretary, several candidates applied, and one of the candidates was hired. If the law firm was later asked who "furnished" the successful candidate to the law firm, it seems highly unlikely that the law firm would respond, "The candidate." It seems far more likely that the law firm would instead respond, "No one."

More importantly, even if the defendants' interpretation of the phrase "furnished to you" were plausible, the Court would nevertheless adopt AMCO's interpretation because it is the only interpretation that gives meaning to all of the words of the policy. As the Minnesota Court of Appeals has instructed:

> Where possible, courts should interpret insurance policies so as to give effect to
> all of their provisions. *Steele v. Great West Cas. Co.*, 540 N.W.2d 886, 888
> (Minn. App. 1995), *review denied* (Minn. Feb. 9, 1996). A court should not adopt
> a construction of a policy that neutralizes one provision if an alternative

-10-

>   construction exists that gives effect to all the policy provisions and is consistent with the parties' general intent. *Employers Reinsurance Corp. v. Caswell*, 490 N.W.2d 145, 148 (Minn. App. 1992), *review denied* (Minn. Nov. 17, 1992).

*Landico, Inc. v. Am. Family Mut. Ins. Co.*, 559 N.W.2d 438, 441 (Minn. Ct. App. 1997).

If the Court adopted the defendants' interpretation — that is, if the Court agreed that a worker could furnish himself to an insured simply by showing up to work — then *every* worker would be "furnished to you" for purposes of the policy, and the phrase would be meaningless. There would be no difference between the definition of "temporary worker" that actually appears in the policy — "a person who is furnished to you . . . to meet seasonal or short-term workload conditions" — and a definition of "temporary worker" that completely omitted the furnished-to-you qualifier — e.g., "a person who meets seasonal or short-term working conditions." Not requiring third-party involvement would, in essence, "read 'furnished to' out of the policy." *Monticello*, 836 N.E.2d at 1115.

The defendants also argue that support for their position that workers can furnish themselves can be found by contrasting the policy's definition of "leased worker" with its definition of "temporary worker." While "leased worker" is defined as "a person leased to you by a labor leasing firm," "temporary worker" is defined simply as "a person who is furnished to you." In the defendants' view, the fact that the definition of "leased worker" explicitly refers to a third party (the "labor leasing firm"), while the definition of "temporary worker" does not, must mean that a "temporary worker" can be self-furnished.

But just because one provision of an insurance policy refers to third-party involvement more explicitly than another provision of the same policy does not mean that third-party involvement is *excluded* from the latter provision. It simply means that the two provisions were

-11-

written with different levels of specificity.  The leased-worker provision requires the involvement of a particular type of third party (a leasing firm).  The temporary-worker provision requires the involvement of *any* type of third party.  But both provisions require third-party involvement.

The defendants also argue that reading the policy as AMCO suggests would not make sense.  The defendants argue that the reason why CGL policies such as AMCO's exclude injuries to employees is because employees are supposed to be covered by worker's compensation insurance.  But, under the laws of at least some states (including, apparently, Minnesota), whether a short-term worker is covered by worker's compensation may not depend on whether the worker is a leased worker or a temporary worker — or on whether a temporary worker has or has not been furnished.  If either *all* short-term workers or *no* short-term workers are protected by worker's compensation, then it makes no sense for a CGL policy to extend coverage to some but not to others.  The defendants cite in support of this argument *Ayers v. C & D Gen. Contractors*, 237 F. Supp. 2d 764, 769 (W.D. Ky. 2002), in which a federal district court obligated to apply Kentucky law held that adopting a third-party requirement "ultimately changes the basic meaning of the contract by including some temporary employees and excluding others based on a seemingly illogical or, at the least, unexplainable distinction."

The problem with the defendants' argument is that the language in the AMCO policy does not apply in just some states.  Rather, the language is standard ISO language that appears in CGL policies in all 50 states, and in some of those states — including, ironically, Kentucky — the distinction made by the language does make sense.  In *Brown*, the Kentucky Supreme Court explained that "[t]he reason the court in *Ayers* found the distinction between temporary workers

and other employees 'unexplainable' and could not 'find the logic' in the distinction was, no doubt, because it was not addressing the issue in the context of an action authorized by the Kentucky Workers' Compensation Act." 184 S.W.3d at 539.  Under that Act, "[t]he reason the 'employee' exclusions apply to leased workers but not to temporary workers 'furnished to you' is that the lessee of a leased employee is required to provide workers' compensation insurance coverage for that employee, whereas a temporary worker remains the employee of the temporary help service that furnished the worker."  *Id.* at 537.

In other words, it appears that in Kentucky (and presumably other states), an employer in the position of Dorpinghaus Construction who hired leased workers or who hired temporary workers who were *not* furnished would have to purchase worker's compensation insurance to cover them.  It thus makes sense to exclude those workers from the employer's CGL policy.  By contrast, an employer in the position of Dorpinghaus Construction who hired temporary workers furnished by an agency would not have to purchase worker's compensation insurance to cover them, as those workers would remain covered by the agency's worker's compensation carrier.  It thus would make sense to extend the employer's CGL policy to cover lawsuits brought by such workers.

Finally, Tommy argues that the Eighth Circuit has already decided that a temporary worker can furnish himself for purposes of a CGL policy.  In *Shelter Mut. Ins. Co. v. Jones*, 343 F.3d 925 (8th Cir. 2003) (per curiam), an insurance company filed a declaratory judgment action, asserting that a worker who had been injured on the job was an employee of the insured and therefore not covered under the CGL policy.  *Id.* at 925-26.  The district court had granted summary judgment to the insured on the ground that the worker was an employee and not an

independent contractor, without considering the temporary-worker exclusion.  The Eighth Circuit affirmed the district court's finding that there was no evidence of an independent-contractor relationship, but remanded the case for a determination on the temporary-worker exclusion.  *Id.* at 926-27.  Tommy argues that since there was nothing in the *Shelter Mutual* record indicating the individual had been furnished to the employer, the Eighth Circuit impliedly held that it was possible for the individual to furnish himself to the employer without a third party.

Tommy reads far too much into the Eighth Circuit's opinion.  The Eighth Circuit merely noted that the district court had not even addressed the temporary-worker exclusion.  The Eighth Circuit quite understandably decided that the issue should be addressed by the district court in the first instance.  The Eighth Circuit made very clear that it "express[ed] no opinion as to whether Knight created a genuine issue of fact on [the temporary-worker] claim."  *Id.* at 927.  The Eighth Circuit did not discuss the record, did not examine the "furnished" language, and did not express any view on whether Knight was or was not a temporary worker.  *Shelter Mutual* cannot possibly be read as holding that a worker can furnish himself for purposes of a CGL policy's temporary-worker definition.

Anticipating that this Court might agree with the majority of courts that a worker must be furnished to an insured by a third party to qualify as a temporary worker for purposes of the CGL policy, Richie and Tommy argue that *Tony* furnished them to Dorpinghaus Construction.  Richie and Tommy are contradicted by their own testimony and by common sense.  Tony was not in the business of supplying workers to others; he was instead employed by Meats, Meals and More, another of his father's businesses.  And neither Richie nor Tommy had ever worked for Tony,

making it difficult for Tony to furnish them to anyone.  Not surprisingly, then, Richie and Tommy negotiated the terms of their arrangements directly with Steven Dorpinghaus.  S. Dorpinghaus I Dep. 44; Rimer I Dep. 29; Lokken Dep. 48.  Neither accepted the job before speaking to Steven Dorpinghaus.  Indeed, when arguing that they were  independent contractors in their briefs and at oral argument, the defendants emphasized that they "made their own deals" with Steven Dorpinghaus.  *See, e.g.*, S. Dorpinghaus Mem. Opp'n Summ. J. 4 n.2; Rimer II Dep. 23-25.  No reasonable jury could find that Tony "furnished" Richie and Tommy to his father.

Richie and Tommy also argue that they were furnished by their respective businesses.  Again, though, no reasonable jury could agree.  Richie's Dreamscapes is in the business of constructing patios and retaining walls, and Do-It-Rite Lawn Care & Snow Removal is in the business of cutting grass and plowing driveways.  Neither is in the business of providing temporary employees to do framing for construction companies.  Moreover, Tony did not call either business to inquire about the availability of one of its employees.  Instead, Tony asked his two buddies if they would help out his dad on a project.  It may be that a jury will decide that Richie's Dreamscapes and Do-It-Rite Lawn Care & Snow Removal provided services to Dorpinghaus Construction *as independent contractors*.  But there is no hint in this record that anyone regarded these businesses as having furnished employees to Dorpinghaus Construction in the manner of "an employment agency, manpower service provider or any similar service." *Allen*, 850 A.2d at 1057.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. AMCO's Motion for Summary Judgment [Docket No. 28] is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED insofar as AMCO seeks a declaration that Richard John Rimer, Tommy John Lokken, and Anthony Steven Dorpinghaus were not "temporary workers" for purposes of the insurance policy issued by AMCO to Steven Dorpinghaus and Dorpinghaus Construction.  The motion is DENIED in all other respects.

2. The motions for summary judgment filed by the defendants [Docket Nos. 44, 49, 55, and 63] are DENIED.


Dated: January 11, 2007                     s/Patrick J. Schiltz                        
                                            Patrick J. Schiltz
                                            United States District Judge